**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**                                                    **Case No.:  8:23-CR-361-WFJ-CPT**

**STEPHEN JAY THORN**

**_____:**

## SENTENCING MEMORANDUM

### I.    Preliminary Statement

Mr. Thorn is now before this court to accept responsibility for his crime and continues his goal of self-improvement, taking care to address his mental health and educate himself in a fashion that will provide the tools he needs to overcome triggers that impact his psychological well being.  His ambition is to ensure that he can continue to grow personally, live a mentally and healthy physical life, and care for the many animals he has adopted and given a home.  Since his arrest, he has abided by all pretrial release terms, has engaged in mental health treatment, in addition to a recent psychological evaluation performed by Dr. Valerie McClain to better understand his individual needs, and now asks this Court to consider the totality of the circumstances when determining a sentence just under the law.

Pursuant to *United States v. Booker*, 125 S. Ct. 738, 756 (2005) and 18 U.S.C. 3553(a), Mr. Thorn respectfully requests that this Court consider these and other factors as it imposes a sentence that is "sufficient but not greater than necessary to comply with" the goals of sentencing as set forth in 18 U.S.C. 3553(a).  Specifically, Mr. Thorn asks this Honorable Court to consider his lack of criminal history, the unique circumstances of Mr. Thorn's career as a gay educator and the time he has dedicated to the support of LGBTQ children, the mental health issues at play at the time of the crime that are now being properly treated, his perfect compliance with Pretrial

Services while on pretrial release, his obligations to the many rescue animals he has[1], and his consistent efforts to continue to improve as a person, as it contemplates a possible downward variance from his sentencing guideline total offense level.

## II.      Legal Framework for Sentencing Analysis

Federal sentencing requires a two-step process.  First, the district court must correctly calculate the sentencing guideline range.  Second, they must consider the factors outlined in 18 U.S.C 3553(a) to determine a reasonable sentence as to each defendant in each case.

In *United States v. Talley*, the Eleventh Circuit enumerated the ten factors used to determine a reasonable sentence: (1) the nature and circumstances of the offense and the defendant's personal history and characteristics; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with appropriate educational training, vocational training, or medical care; (6) types of sentences available; (7) the correctly calculated sentence range under the sentencing guidelines; (8) pertinent policy statements of the United States Sentencing Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victim of the crime.  431 F.3d 784, 786 (11th Cir. 2005).

## III.      Analysis of 18 U.S.C. 3553(a) Factors

### A.  *Nature and Circumstances of the Offense*

Mr. Thorn was charged via Indictment on September 6, 2023, with one count of transmitting a threat into interstate commerce in violation of 18 U.S.C. § 875(c), and one count of making telephone calls without disclosing his identity with the intent to make a threat in

---

[1] Mr. Thorn is an animal lover that has adopted and care for 23 cats and three dogs currently.

violation of 47 U.S.C. § 223(a)(1)(C).  Mr. Thorn's criminal actions occurred after calling in threats to a federal judge in the Middle District of Florida related to the judge's dismissal of an unrelated civil case brought to challenge the 'don't say gay' legislation in Florida.

Mr. Thorn is a gay man who has spent his life as an educator.  Specifically, he dedicated a large portion of his time and career in an effort to help and support LGBTQ students through bullying and the difficulties they have faced, and continue to face, in a society not always kind to individuals that are not like the masses.  Throughout his career he has held the hands of gay children on the verge of suicide, visited with those who have attempted same, and himself struggle with his mental health, due in part to society's treatment toward he and other members of the gay population throughout his lifetime.  He has been on the frontlines of the fight for equality for members of the LGBTQ population, stood hand in hand with other members of the LGBTQ population after atrocities such the PULSE nightclub shooting, and has sat with interest as Florida's government has proposed legislation that would seem to infringe on rights that directly influence the LGBTQ community.

Mr. Thorn is most certainly not proud of his crimes; to the contrary he is mortified for his conduct.  He has embarrassed himself, believes he has acted wholly outside of his character, but mostly he wishes to atone for his actions due to the stress and fear he caused in the minds of his victim and the family of the victim.  In all the conversations undersigned counsel has had with Mr. Thorn, it is the impact his actions had, or could have had, on the minds of the judge and judge's family that causes the most remorse in Mr. Thorn.  He is cognizant of his crime and takes very seriously the emotional damage he could have caused.  He was a teacher of children and recognizes that his commentary encapsulated children.  For all things related to his actions, he is genuinely remorseful.

B. *History and Characteristics of the Defendant*

Mr. Thorn is a 66-year-old man who has known a wild life of turmoil and change.  While initially his family life, as a child, was healthy and comfortable, this would all change when Mr. Thorn's father had an affair with his babysitter, leaving Mr. Thorn and his siblings with his mother to care for on her own.  Going from being a homemaker and the wife of a prominent lawyer in Miami to effectively being ejected from her home, caused a considerable change in Mr. Thorn's mother.  Time and hardship would erode her caretaking and nurturing of her children, replacing it with bitterness and fatigue.  What was once a caring, compassionate woman, changed into an emotionally unhealthy individual struggling to survive without the ability to handle three children, a job as a cab driver, and the rigors life threw at her.

With the demands of working to support her family, came the incidental and undoubtedly unintentional inability to properly care for her children.  As life's demands presented, Mr. Thorn and his siblings were forced to tend to themselves without supervision.  As is so often the case, when a parent is absent, the door opens for those with predatory intent and this is exactly what happened to Mr. Thorn at the hands of his sexually abusive neighbor.  For three years Mr. Thorn was forced into sexual servitude at the hands of this neighbor.  These horrific acts were hidden under a guise that the predator was teaching piano to local youth.  When Mr. Thorn attempted to blow the whistle on his victimization, his mother reacted as if it was Mr. Thorn's fault, blamed him, and shamed him unmercifully.  From this point forward Mr. Thorn's treatment at the hands of his mother deteriorated, eventually leading to him running away to New York City.

New York's treatment of Mr. Thorn was even more deplorable than his prior conditions, seeing Mr. Thorn become a child prostitute, forced into abhorrent acts.  Mr. Thorn sought solace in other child sex slaves, finding some form of safe harbor, even if just an illusion.  It was only

when his best friend was eventually sold to a sex brothel by his family member that Mr. Thorn sought aid from his an uncle he had living in New York; an uncle that took him in and cared for him until Mr. Thorn's eventual return to Florida.

When Mr. Thorn returned to Florida, rather than welcoming him with loving arms, Mr. Thorn's mother sent him to a mental institution to *treat* him for his *bad* behavior, viewing his victimization as a mental health issue of his, rather than the fact that he had been forced into a life of brutal rape and molestation. His body repeatedly violated, torn, and injured from the sexual assaults against him, he was now enduring the same assault upon his mental health due to his mother's cruelty. Eventually, Mr. Thorn was removed from the State hospital and returned home where he essentially raised himself from a teenager.

Mr. Thorn is the father of two sons and was married to their mother until 1985. Mr. Thorn, considering his generation and growing up in a time where homosexuality was not as accepted as it is today, struggled to come out until later in life. After the culmination of his divorce he was able to identify as the man he is, openly engaging in relationships with men, the longest with Victor Wayne Moody prior to Mr. Moody passing away from AIDS complications. Mr. Thorn would later enter into a civil union with Frederick Carter prior to their union dissolving in 2017.

Mr. Thorn, having lived a very difficult and strenuous life, is unsurprisingly not a healthy man. He currently suffers from neuromuscular disorder called Myotonia. He has been diagnosed with depressive disorder and is bi-polar. Mr. Thorn attempted suicide in 2014 and has been receiving mental health counselling while on pretrial release. Mr. Thorn was recently evaluated by Dr. Valerie McClain who diagnosed him with post-traumatic stress disorder likely secondary to the treatment inflicted upon him by his mother in addition to his victimization

instances.  Additionally, Dr. McClain diagnosed him with major depressive disorder.

Mr. Thorn is a rather uncommon case for our Federal criminal courts.  Unlike so many other Federal defendants, Mr. Thorn has no criminal history.  His criminal history score is zero and in accord, his criminal history level is one.  Mr. Thorn is an educated man possessing two bachelor's degrees, one in journalism from the University of Florida and one in education from the University of North Florida.  Mr. Thorn, as referenced above, was a teacher over the course of his career and in fact retired from teaching.

Over the course of his life, Mr. Thorn has consistently done the right thing, but for this aberrant day in October 2022.  Undoubtedly Mr. Thorn's actions were colored by his own personal struggles and the struggles he aided so many others overcome.  His actions irrational and in fact misplaced, his conduct was that of an individual triggered to defend LGBTQ children, despite his inability to do so in an acceptable, healthy fashion, and aimed in the direction where he could perhaps make a healthy, meaningful difference.

C.  _Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment_

Mr. Thorn is charged with placing five phone calls and leaving threatening voicemails on a federal judge's chambers phone line.  While his language was obscene and conduct in fact concerning considering the world we live in today, he did not travel to the judge, made no physically harmful gesture, and in reality his conduct in making the threat was nothing more than lip service.  Nonetheless, it is not lost on Mr. Thorn or undersigned counsel how his actions would be received.  He was out of line, committed a crime, and had no business conducting himself in such an invasive manner.  He understands this well.  His calculated sentence is recommended to be 24 to 30 months in the Federal bureau of prisons, however because his crime

is a class D felony, he would be eligible for up to five years of probation.

This Honorable Court has no doubt heard argument under 3553 more times than I've ever even thought about it. Far be it from Counsel to imagine an argument on this subject that these courtroom walls haven't heard thousands of times. The offense in this case is a serious one. A man called in a threat to a federal judge and now finds himself in federal criminal court about to be sentenced by another federal judge. Society and our system of order cannot have our citizenry lashing out at our judicial officers, lobbing threats in their direction. It is not acceptable in any way.

That said, this action was borne from a very personal motivation and from an individual that has known personally the hurt that can be inflicted against the LGBTQ community. The actions were committed in the heat of a moment comprising a limited time, over one day, projected from a person that needs continued mental health care to accommodate from the very abhorrent acts committed upon him that precipitated the triggering this judge's ruling did. To be frank, the reaction was not logical from an emotional sense. Additionally, Mr. Thorn, in his reaction believed the ruling was handed down with personal bias, rather than a ruling based in the law. Regardless of one's personal opinion on the matter, the judge ruled in consideration of what the law commanded, rather than personal vendetta or opinion, a fact not recognized then by Mr. Thorn but one that is recognized now. Cooler heads prevail they say.

This was a one day affair. There was no premeditation, no planning, and nothing in the discovery or record to indicate that Mr. Thorn had any vendetta against the judge, knew anything as to the judge's political leanings, or even knew the judge's name. Due to the knee jerk, reactionary nature of the crime, it is wholly logical to say that the actions of Mr. Thorn were impacted considerably by poor mental health.

So what is the sentencing answer?  Undersigned would venture to say no one in the courtroom at sentencing would think Mr. Thorn is a violent, vile human at the core of his being. A man needing mental healthcare yes, but this is a man that has dedicated his life to serving others through teaching, sheltering vulnerable kids from the storm of understanding themselves in a world that is not often accepting, and a man that has cared for sick loved ones.  While perhaps both supportive of his mental health needs and his compassionate nature, Mr. Thorn struggles to pass an animal in need of shelter and food; as indicated by the veritable farm he has at his home.  Respectfully, Mr. Thorn would do well to receive competent mental healthcare and court supervision as an appropriate sentence considering his crime, health needs, and lack of any criminal history.

D.  <u>To Afford Adequate Deterrence to Criminal Conduct</u>

There is generally no significant association between perceptions of punishment levels and actual levels … implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms."  Gary Kleck, et al, *The Missing Link in General Deterrence Theory,* 43 Criminology 623 (2005).  Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").  Typical of the findings on general deterrence are those of the Institute of Criminology at Cambridge

University. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European countries. *Id.* at 1.  It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance." *Id.* at 2. The report concluded that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1.  According to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

While the aforementioned studies often compare noncustodial sentences to custodial sentences, the spirit of the findings is that a longer prison term is not effective as a deterrent for recidivism.  Respectfully, a longer sentence, or an incarceration sentence for Mr. Thorn will not further deter criminal conduct.  Specifically, it is highly unlikely Mr. Thorn will ever commit another crime again.  He had no criminal history prior to this matter and in reality, his actions weren't borne of a malicious intent, rather the instinctual need to defend children, albeit grossly misplaced and performed inappropriately.  As for general deterrence, Mr. Thorn's case is so incredibly unique in the totality of the circumstances of it that it is arguably distinguishable from just about any other instance of threatening a federal judge.

E.  *The Need to Protect the Public from Further Crimes of the Defendant*

Based on Mr. Thorn's exemplary history and personal characteristics, it seems apparent

that his criminal acts represent a solitary and rare occurrence in an otherwise law-abiding life.  But the contention that Mr. Thorn poses an exceptionally low risk of recidivism is not merely based on mere intuition.[2]  Indeed, empirical evidence establishes that Mr. Thorn's history and characteristics obviates the § 3553 factor of specific deterrence.

Mr. Thorn is 66-years-old with no criminal history. Moreover, he has no substance abuse problems (Mr. Thorn drinks very rarely and not for a reason involving mental health), has two bachelor's degrees, and is retired from gainful, legitimate employment.  Because of his lack of criminal history, education, and employment history, Mr. Thorn poses an extremely low risk of recidivism. *See* U.S. Sent. Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004).

Finally, Mr. Thorn's conduct since his crime not only pertains to his history and characteristics, but also applies to his specific risk of recidivism. *See United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007); *Pepper v. United States*, 562 U.S. 476 (2011); *Gall v. United States*, 552 U.S. 38 (2007)("Gall's self-motivated rehabilitation ... lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect the public from his future criminal acts" )(citing §§ 3553(a)(2)(B)-(C))).

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Thorn, this Court should consider the statistically low risk of recidivism presented by him. *United States v. Urbina*, slip op., 2009 WL 565485, *2-3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties). The fact that Mr. Thorn is in a Criminal History Category of

---

[2] This is not to say that the human attribute of intuition should be disregarded. As the neuro-psychologist Malcolm Gladwell has found, intuition or instinct is a significant adaptive mechanism which often results in the most valid and effective decisions. *See* Malcolm Gladwell, *Blink* (Little, Brown & Co. 2005).

I at the age of 66-years-old further supports his request for a variance. *See* 28 U.S.C. § 994(j) (Congress stressed "the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."); *see also United States v. Paul*, 561 F.3d 970, 973 (9th Cir. 2009) (where defendant convicted of embezzlement and faced a guidelines sentence of 10-16 months, sentence of 15 months was unreasonably high in part because defendant was a first-time offender with no criminal record whatsoever); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (district court's *sua sponte* variance to probation not unreasonable in part because guidelines "did not fully account for [the defendant's] complete lack of criminal history").

Furthermore, Mr. Thorn's praiseworthy life further establishes that he is not likely to engage in criminal conduct in the future. Finally, Mr. Thorn's loss of reputation further underscores the tenet that he poses a low risk of recidivism. *See Adelson* 441 F.Supp.2d at 514 (stating that "[w]ith [the defendant's] reputation ruined by his conviction, it was extremely unlikely that she would ever involve himself in future misconduct."). In the absence of a deterrent effect, Mr. Thorn submits that a variance is warranted in his case.

Sentencing Mr. Thorn to a term of imprisonment will not impact his recidivism risk in a positive fashion. Empirical data fails to establish a relationship between the length of sentence and specific deterrence, regardless of the crime. *See* National Institute of Corrections, *Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016); *see also* Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that

"[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame"). In sum, the best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

The 2016 study by the National Institute of Corrections establishes three principles. First, incarceration has a negligible impact on crime prevention.  Instead, a longer prison sentence may actually lead to a greater risk of recidivism.  There is strong evidence that prison—by disrupting education and employment, reducing prospects for future employment, weakening family ties and exposing less serious offenders to older more serious offenders—leads to increased recidivism.  Arguably for Mr. Thorn, being away from his family, home, and animals, would exact a negative affect rather than rehabilitative.  *See The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).  Additionally, per the 2016 study by the National Institute of Corrections, harsh penalties do not improve the long-term outcomes of the offender. *See also* Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887) ("All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance."*).* Finally, community correction programs are more effective in reducing recidivism. *Id*. at 5.

IV.   <u>**Conclusion**</u>

For the foregoing reasons, Mr. Thorn respectfully submits that he be considered for a probationary sentence of five years, involving mental health treatment.  Respectfully, Mr. Thorn submits that the requested sentence is sufficient but not greater than necessary to comply with

the statutory directives set forth in 18 U.S.C. § 3553.  He asks for this sentence below his current

guideline recommendation for the factors referenced in this memorandum,.

Respectfully submitted this 26th Day of August, 2024.

/S/ Jason M. Mayberry
MAYBERRY LAW FIRM
Jason M. Mayberry
FBN- 36212
Attorneys for the Defendant
402 E. 7th Ave.
Tampa, FL 33602
Ph-813-444-7435

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by Electronic Mail

to the Office of the United States Attorney, 26th Day of August, 2024.

/S/ Jason M. Mayberry
JASON M. MAYBERRY, Esq.